ACCEPTED
14-15-00030-CR
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
10/9/2015 4:03:52 PM
CHRISTOPHER PRINE
CLERK

No. 14-15-00030-CR

IN THE COURT OF APPEALS
FOURTEENTH DISTRICT
HOUSTON, TEXAS

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
10/9/2015 4:03:52 PM
CHRISTOPHER A. PRINE
Clerk

MIGUEL MACIAS,
APPELLANT

VS.

THE STATE OF TEXAS,
APPELLEE

APPEAL FROM THE 427TH DISTRICT COURT
TRAVIS COUNTY, TEXAS
CAUSE NUMBER D-1-DC-13-301734
HONORABLE JUDGE JIM CORONADO, PRESIDING

## STATE'S BRIEF

ROSEMARY LEHMBERG
DISTRICT ATTORNEY
TRAVIS COUNTY, TEXAS

M. SCOTT TALIAFERRO
TEXAS BAR NO. 00785584
ASSISTANT DISTRICT ATTORNEY
DIRECTOR, APPELLATE DIVISION
DISTRICT ATTORNEY'S OFFICE
P.O. BOX 1748
AUSTIN, TEXAS 78767
PHONE: 512.854.3626   FAX: 512.854.4810
EMAIL:  scott.taliaferro@traviscountytx.gov
        AND AppellateTCDA@traviscountytx.gov

**THE STATE DOES NOT REQUEST ORAL ARGUMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iv

STATEMENT REGARDING ORAL ARGUMENT ........................................... vi

STATEMENT OF THE CASE ........................................................................... vi

STATEMENT OF FACTS ................................................................................. 2

SUMMARY OF THE ARGUMENTS................................................................ 4

THE STATE'S REPLY TO THE FIRST POINT OF ERROR.............................. 5

THE EVIDENCE IS LEGALLY SUFFICIENT TO PROVE THAT THE
APPELLANT'S VEHICLE WAS USED OR EXHIBITED AS A DEADLY WEAPON. ........ 5

1.      Background.................................................................... 5

2.      Standard governing legal-sufficiency review ............................ 6

3.      The definition of "deadly weapon" .................................... 8

4.      The evidence is sufficient to support deadly-weapon finding......11

   a.      The appellant's use and intended use of his car........................12

   b.      The car was capable of causing death or serious injury ...............17

5.      Conclusion....................................................................19

THE STATE'S REPLY TO THE SECOND POINT OF ERROR.........................20

THE TRIAL COURT DID NOT ABUSE ITS DISCRETION WHEN IT OVERRULED
THE APPELLANT'S OBJECTION TO THE TESTIMONY OF SGT. JONES. .................20

1.      Background....................................................................20

2.      Standard governing admission of expert testimony at trial ..........24

3.      Standard governing appellate review .........................................25

4.      The trial court did not abuse its discretion.................................26

   a.      Jones was qualified to provide expert testimony .........................27

      i.      The first criterion .....................................................29

      ii.      The second criterion...................................................31

      iii.      The third criterion .....................................................33

      iv.      The trial court did not err ...........................................35

   b.      Tire mark analysis was an appropriate for expert testimony........35

   c.      The expert testimony was relevant ...........................................37

   d.      No abuse of discretion has been shown.....................................37

5.      Any error was harmless ................................................37

6.      Conclusion....................................................................41

THE STATE'S REPLY TO THE THIRD POINT OF ERROR ...........................42

THE EVIDENCE IS LEGALLY SUFFICIENT TO ESTABLISH THAT THE
APPELLANT ACTED EITHER INTENTIONALLY OR KNOWINGLY. ......................42

1.      Standard governing legal-sufficiency review ............................42

2.      Definitions of "intentionally" and "knowingly" ........................42

        3.         The evidence is legally sufficient ...............................................45
PRAYER .......................................................................................................49
CERTIFICATE OF COMPLIANCE......................................................................50
CERTIFICATE OF SERVICE.............................................................................50

# TABLE OF AUTHORITIES

**Cases**

*Allen v. State*, 249 S.W.3d 680 (Tex. App.—Austin 2008) .................................. 7

*Alvarado v. State*, 912 S.W.2d 199 (Tex. Crim. App. 1995) .................................. 6

*Amis v. State*, 910 S.W.2d 511 (Tex. App.—Tyler 1995, pet. ref'd) .....................25

*Anderson v. State*, 416 S.W.3d 884 (Tex. Crim. App. 2013) ...........................8, 43

*Asberry v. State*, 813 S.W.2d 526 (Tex. App.—Dallas 1991, pet. ref'd) ................ 6

*Bagheri v. State*, 119 S.W.3d 755 (Tex. Crim. App. 2003) ...............................38

*Bailey v. State*, 46 S.W.3d 487 (Tex. App.—Corpus Christi 2001, pet. ref'd) .......10

*Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010) .................................6, 39

*Brooks v. State*, 990 S.W.2d 278 (Tex. Crim. App. 1999) ......................................39

*Clayton v. State*, 235 S.W.3d 772 (Tex. Crim. App. 2007) ...........................passim

*Conner v. State*, 67 S.W.3d 192 (Tex. Crim. App. 2001) .................................7, 15

*Drichas v. State*, 175 S.W.3d 795 (Tex. Crim. App. 2005) .............................11, 17

*Harnett v. State*, 38 S.W.3d 650 (Tex. App.—Austin 2000, pet. ref'd) .................26

*Hooper v. State*, 214 S.W.3d 9 (Tex. Crim. App. 2007) ...................................... 7

*Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 5 (1979) ......passim

*Johnson v. State,* 967 S.W.2d 410 (Tex. Crim. App. 1998) ...................................38

*Johnston v. State*, 115 S.W.3d 761 (Tex. App.—Austin 2003), aff'd, 145 S.W.3d
 215, (Tex. Crim. App. 2004) ................................................................................18

*Kelly v. State,*, 824 S.W.2d 568 (Tex. Crim. App. 1992) ................................25, 35

*King v. State*, 953 S.W.2d 266 (Tex. Crim. App. 1997) .......................................38

*Landrian v. State*, 268 S.W.3d 532 (Tex. Crim. App. 2008) ................................44

*Lopez v. State*, 18 S.W.3d 220 (Tex. Crim. App. 2000) .......................................25

*Lopez v. State*, 628 S.W.2d 77 (Tex. Crim. App. 1982) .......................................25

*Malik v. State*, 953 S.W.2d 234 (Tex. Crim. App. 1997) .................................8, 43

*Mann v. State*, 13 S.W.3d 89 (Tex. App.—Austin 2000), *aff'd*, 58 S.W.3d 132
 (Tex. Crim. App. 2001) .......................................................................................18

*Merritt v. State*, 368 S.W.3d 516 (Tex. Crim. App. 2012) ...............................10, 45

*Mills v. State*, 440 S.W.3d 69 (Tex. App.—Waco 2012, pet ref'd) ....................9, 11

*Moreno v. State*, 755 S.W.2d 866 (Tex. Crim. App. 1988) ................................7, 8

*Newsome v. State*, No. 01-14-00834-CR, 2015 Tex. App. LEXIS 7365 (Tex.
 App.—Houston [1st Dist.] July 16, 2015) (not designated for publication) .......19

*Patrick v. State*, 906 S.W.2d 481 (Tex. Crim. App. 1995) .............................10, 45

*Rodgers v. State*, 205 S.W.3d 525 (Tex. Crim. App. 2006) ...........................passim

*Roise v. State*, 7 S.W.3d 225 (Tex. App.—Austin 1999), cert. denied, 531 U.S.
 895, 121 S.Ct. 225, 148 L.Ed.2d 160 (2000) .....................................................27

*Sanders v. State*, 119 S.W.3d 818 (Tex. Crim. App. 2003) ................................... 7

*Saxton v. State*, 804 S.W.2d 910 (Tex. Crim. App. 1991) ..................................... 6

*Vela v. State*, 209 S.W.3d 128 (Tex. Crim. App. 2006)...........................................25

**Statutes**

Tex. Code Crim. Proc. art. 38.04........................................................................ 6

Tex. Penal Code § 1.07 ...............................................................9, 10, 11, 17

Tex. Penal Code § 22.01 ...........................................................................42, 44

Tex. Penal Code § 22.02 ...........................................................................vii, 8, 42

Tex. Penal Code § 6.03 ...........................................................................43, 44, 48

**Other Authorities**

Brown & Rondon, *Texas Rules of Evidence Handbook* (2013) .............................25

**Rules**

TEX. R. EVID. 104 .......................................................................................25

TEX. R. EVID. 702 .......................................................................24, 27, 35, 37

TEX. R. EVID. 705 .......................................................................................35

## STATEMENT REGARDING ORAL ARGUMENT

The State does not request oral argument. By letter dated September 24, 2015, the Court notified the parties that this case is scheduled for submission without oral argument on the briefs.

## STATEMENT OF THE CASE

The appellant was charged by indictment with committing the offense of aggravated assault The indictment alleged, *inter alia*, that the appellant by threatened a police officer with imminent bodily injury and that he used or exhibited a deadly weapon during the commission of the offense. CR 14; *see* Tex. Penal Code § 22.02(b)(2)(B).

On November 17, 2013, a jury was sworn and a trial on the merits commenced. 8 RR 203. The jury returned its verdict on November 20, 2014, finding the appellant guilty of aggravated assault as alleged in the indictment. 11 RR 6. Later that same day, the appellant pled true to the enhancement allegations, and the jury assessed his punishment at imprisonment for a term of 32 years. 11 RR 10-11, 27-28.

On November 20, the appellant filed a motion for new trial and a notice of appeal. CR 97, 98. A second notice of appeal was filed on December 1, 2014. CR 106. The trial court has certified that the appellant has the right of appeal. CR 94.

No. 14-15-00030-CR

IN THE COURT OF APPEALS
FOURTEENTH DISTRICT
HOUSTON, TEXAS

MIGUEL MACIAS,
APPELLANT

VS.

THE STATE OF TEXAS,
APPELLEE

APPEAL FROM THE 427TH DISTRICT COURT
TRAVIS COUNTY, TEXAS
CAUSE NUMBER D-1-DC-13-301734
HONORABLE JUDGE JIM CORONADO, PRESIDING

**STATE'S BRIEF**

**TO THE HONORABLE COURT OF APPEALS:**

The State of Texas, by and through the District Attorney for Travis County, respectfully submits this brief in response to that of the appellant, Miguel Macias.

## STATEMENT OF FACTS

On August 31, 2013, Officer Shane Cunningham received a call to respond to a suspected burglary at the Johnson Supply Company. 10 RR 18-19. He initially drove past that location in order to assist a sergeant who had stopped a vehicle nearby. 10 RR 20. When Cunningham passed by the site of the suspected

burglary, the appellant and his accomplice (Austin Hanlon) saw Cunningham drive by. They had just completed the burglary, and it was clear to them that Cunningham was an Austin Police Department ("APD") officer. 9 RR 120-21.

Upon hearing that another officer would assist the sergeant, Officer Cunningham drove back toward the business to see whether a burglary had occurred. 10 RR 21. As he approached the site, he saw a man putting something in the back of a vehicle parked next to the building. 10 RR 21. The burglars were putting stolen merchandise into the car. 9 RR 120.

The officer activated his overhead lights as he drove into the parking lot. 10 RR 21. The suspects' vehicle, which was driven by the appellant, backed up and hit a dumpster. *Id.* Anticipating that the suspects would flee in their vehicle, Officer Cunningham prepared to follow that vehicle. 10 RR 22-23.

As Cunningham watched, however, the suspect vehicle pulled forward and hit his police car head-on. 10 RR 22. Cunningham considered the appellant's conduct to be a threat, a display of aggression toward him. 10 RR 27, 29. He radioed to other officers that he had been hit. 10 RR 22. Officer Cunningham then tried to exit his vehicle. 10 RR 23. He positioned himself "half in and half out" of the vehicle and aimed his gun at the appellant. 10 RR 26. He yelled at the appellant and Hanlon to put their hands up. 10 RR 23. Both suspects failed to comply. 10 RR 38, 10 RR 39.

3

The appellant's car then began to push the police car backward. 10 RR 28. Shocked, the officer realized that he was no longer in control of the vehicle and that the other vehicle was not stopping. 10 RR 29. His outside foot moved to the floorboard and his weapon was trained over the hood of the car toward the other vehicle. *Id.* He felt threatened. *Id.* As his car moved backwards, Officer Cunningham fired at the appellant. 10 RR 30. He fired 15 shots at the driver. 9 RR 26. Officer Cunningham's patrol vehicle finally came to a stop when the appellant's car pushed it into a large oak tree. 10 RR 30

## SUMMARY OF THE ARGUMENTS

**Point One**: In his first point of error, the appellant challenges the sufficiency of the evidence to establish that his vehicle was used or exhibited as a deadly weapon during the commission of the offense. That claim lacks merit because the car, in the manner of its use and intended use, was capable of causing death or serious bodily injury.

**Point Two**: In his second point of error, the appellant claims that the trial court erred when it overruled his objection to the opinion testimony of a crash investigator whose testimony was based primarily upon tire marks found at the crime scene. That point of error should be overruled because the trial court acted within the scope of its discretion and because any error was harmless.

**Point Three**:  In his third point of error, the appellant claims that the evidence is insufficient to establish that he acted intentionally or knowingly in causing his car to strike a police car.  That point should be overruled because circumstantial evidence, viewed in the light most favorable to the State, supports a rational inference that the appellant acted intentionally or knowingly.

## THE STATE'S REPLY TO THE FIRST POINT OF ERROR

THE EVIDENCE IS LEGALLY SUFFICIENT TO PROVE THAT THE
APPELLANT'S VEHICLE WAS USED OR EXHIBITED AS A DEADLY WEAPON.

<u>Argument and Authorities</u>

In his first point of error, the appellant asserts that the evidence "is insufficient to show Appellant's vehicle was used or exhibited as a deadly weapon."  App. Brief at 11.

### 1. **Background**

In the instant case, the appellant's conviction for aggravated assault against a public servant was predicated, *inter alia*, upon an allegation that the appellant "did then and there use or exhibit a deadly weapon, to-wit: a motor vehicle, during the commission of the aforesaid offense…"  CR 14.  The application paragraph of the jury charge authorized a conviction only if the jury found that allegation (as well as others) to be true.  See CR 80-81.  The jury found the appellant "guilty of the offense of aggravated assault, as alleged in the indictment" thereby implicitly

5

finding that the appellant had used or exhibited a deadly weapon.  CR 83.  The judgment form properly reflects the entry of an affirmative deadly-weapon finding. CR 101; *see Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd).

## 2.  <u>Standard governing legal-sufficiency review</u>

When assessing the legal sufficiency of the evidence to support a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).   The Court should not review the evidence for factual sufficiency.  *See Brooks v. State*, 323 S.W.3d 893, 894-95 (Tex. Crim. App. 2010) (abolishing factual-sufficiency review).

It is well settled that the jury is the exclusive judge of the facts proved, the weight to be given to the testimony, and the credibility of the witnesses.  *See* Tex. Code Crim. Proc. art. 38.04; *Alvarado v. State*, 912 S.W.2d 199, 207 (Tex. Crim. App. 1995).  The jury is free to accept or reject any or all of the evidence presented by either party.  *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). Accordingly, the *Jackson* standard requires the appellate court to defer to the jury's factual determinations and thereby "gives full play to the responsibility of the trier

6

of fact to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." 443 U.S. 307, 319. "Under the *Jackson* standard, the reviewing court is not to position itself as a thirteenth juror in assessing the evidence. Rather, it is to position itself as a final, due process safeguard ensuring only the rationality of the factfinder." *Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). It is not the reviewing court's duty to disregard, realign, or reweigh the evidence. *Id.*

In short, the task of the appellate court during a sufficiency review is merely to "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). Direct evidence and circumstantial evidence are to be treated equally, and the evidence to be reviewed even includes evidence that was improperly admitted. *Clayton*, 235 S.W.3d 772, 778; *see Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001); *Allen v. State*, 249 S.W.3d 680, 688-89 (Tex. App.—Austin 2008). "The legal sufficiency standard requires the reviewing court to look only at the evidence supporting the verdict and to presume that any conflicts in the evidence were resolved in favor of the prosecution." *Sanders v. State*, 119 S.W.3d 818, 822 (Tex. Crim. App. 2003); *see Jackson*, 443 U.S. at 326.

7

The jury's verdict must stand unless the reviewing court finds it to be irrational or unsupported by more than a "mere modicum" of evidence, with such evidence being viewed in the light of *Jackson*. *Moreno*, 755 S.W.2d 866, 867.

### 3. **The definition of "deadly weapon"**

In the case at bar, the appellant does not mount a broad challenge to the sufficiency of the evidence. Instead, his claim is limited to the narrow assertion that the evidence "is insufficient to show Appellant's vehicle was used or exhibited as a deadly weapon." App. Brief at 11. Thus, the resolution of this point of error hinges upon the definition of the term "deadly weapon."

In the instant case, the use or exhibition of a deadly weapon was an element of the offense of aggravated assault. *See* Tex. Penal Code § 22.02(a)(2); CR 14 (indictment); CR 80-81 (application paragraph of jury charge). For purposes of a sufficiency analysis, however, the elements of an offense are defined, not by reference to the indictment or the jury charge, but instead by reference to a hypothetically correct jury charge. *Anderson v. State*, 416 S.W.3d 884, 889 (Tex. Crim. App. 2013); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge is "one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." 953 S.W.2d at 240.

8

In this case, a hypothetically correct jury charge would track the Penal Code's definition of the term "deadly weapon." The Code defines "deadly weapon" as including "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury."[1] Tex. Penal Code § 1.07(a)(17)(B).

In *McCain v. State*, 22 S.W.3d 497 (Tex. Crim. App. 2000), the Court of Criminal Appeals made it clear that, to establish use or exhibition of a deadly weapon, the State need not prove that the actor intended to cause death or serious bodily injury. *Id*. at 503. Instead, the court held that the State need only prove that the actor <u>intended</u> a use of the object in which it would be <u>capable</u> of causing death or serious bodily injury. *Id*.; *see also Mills v. State*, 440 S.W.3d 69, 73 (Tex. App.—Waco 2012, pet ref'd) ("The placement of the word 'capable' is crucial to understanding the definition in determining deadly-weapon status applicable to this case").

Referring to the statutory definition of "deadly weapon," the *McCain* court reasoned as follows:

> The statute does not say "anything that in the manner of its use or intended use causes death or serious bodily injury." Instead the statute provides that a deadly weapon is "anything that in the manner

---

[1] The jury charge in this case utilized that same language, stating, "'Deadly weapon' means anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." CR 79.

9

of its use or intended use is *capable* of causing death or serious bodily injury." § 1.07(a)(17)(B).... The provision's plain language does not require that the actor actually intend death or serious bodily injury; an object is a deadly weapon if the actor intends a use of the object in which it would be capable of causing death or serious bodily injury. The placement of the word "capable" in the provision enables the statute to cover conduct that threatens deadly force, even if the actor has no intention of actually using deadly force.

*McCain*, 22 S.W.3d 497, 503 (emphasis in original, citation omitted).

It is well settled that "[i]ntent may … be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant." *Merritt v. State*, 368 S.W.3d 516, 526 (Tex. Crim. App. 2012); *see Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995).

More specifically, the intent addressed in *McCain* (i.e., that the actor intended a use of the object in which it would be capable of causing death or serious bodily injury) can be inferred where the actor uses the object to inflict injury. *See, e.g.*, *Bailey v. State*, 46 S.W.3d 487, 491 (Tex. App.—Corpus Christi 2001, pet. ref'd) (where victim was actually beaten with boards, the appellate court held, in light of *McCain*, that "a rational fact finder could conclude that appellant intended to hit Cassandra with the boards in such a manner that they would be capable of causing serious bodily injury or death"). Such an intent can also be inferred where the actor uses the object in a threatening manner. *See McCain*, 22 S.W.3d 497, 503 ("objects used to threaten deadly force are in fact deadly weapons").

The Penal Code definition of "deadly weapon" has been broadly construed. In *Drichas*, for example, the Court of Criminal Appeals made it clear that a vehicle may constitute a deadly weapon based upon the manner of its use:

> Objects that are not usually considered dangerous weapons may become so, depending on the manner in which they are used during the commission of an offense. A motor vehicle may become a deadly weapon if the manner of its use is capable of causing death or serious bodily injury. Specific intent to use a motor vehicle as a deadly weapon is not required.

*Drichas v. State*, 175 S.W.3d 795, 798 (Tex. Crim. App. 2005) (citations omitted).

Significantly, a vehicle may also constitute a deadly weapon based upon the manner of its *intended* use. Referring to a pickup truck, one appellate court emphasized that, under the Penal Code definition, "it is either the use or *intended* use of an object which can make it a deadly weapon." *Mills v. State*, 440 S.W.3d 69, 73 (Tex. App.—Waco 2012, pet. ref'd) (emphasis in original), citing, *inter alia*, Tex. Penal Code § 1.07(a)(17)(B) and *McCain*, 22 S.W.3d 497, 503.

## 4. The evidence is sufficient to support a deadly-weapon finding

In the instant case, the first point of error should be overruled because the evidence, viewed in the light most favorable to the State, supports a rational inference that the appellant's vehicle was, in the manner of its use or intended use during the offense, capable of causing death or serious bodily injury.

## a.  The appellant's use and intended use of his car

Here, the jury could reasonably have concluded that the appellant intended to cause, and did in fact cause, his vehicle to strike and push the police car that was occupied by Officer Shane Cunningham.  After the officer arrived at the crime scene in a marked patrol car, the appellant backed his car up and hit a dumpster.  10 RR 21-22.  The appellant then revved his engine (10 RR 102, 106) and "accelerate[d] forward," causing the front of his car to hit the front of the police car.  10 RR 22, 106.  During the trial, Cunningham characterized that strike as "a pretty good hit." *Id*. at 22; *see id. at* 57.  The force of the impact was significant enough that the officer put out on the radio that he had "been hit." *Id*. at 59.

Viewed in the requisite light, the record supports an inference that the appellant acted intentionally when he caused his car to strike Officer Cunningham's car.  The appellant was clearly in a position from which he could see the police car, because the two vehicles were facing each other when the incident occurred.  Officer Cunningham's vehicle—a black-and-white police car with its overhead emergency lights flashing—was clearly visible to the appellant. *See* 10 RR 21; State's Exhibits 1 and 2.  The lights were described at trial as "very bright."  10 RR 103.  Indeed, the record reflects that the appellant saw the police car, and recognized it as a police car, even before he backed into the dumpster.  9 RR 120-21; 10 RR 104.

12

The jury could reasonably have concluded that the appellant made no attempt to avoid the police car as he drove forward. Officer Cunningham testified that there were multiple access points from which to enter and exit the parking lot. 10 RR 23. He also testified that, before the initial collision occurred, there was sufficient space between the vehicles for the appellant to turn his car and flee the scene if the appellant wanted to do so. *Id.* When the officer initially drove the police car into the parking lot, he was not attempting to block the path of the appellant's car. In fact, Officer Cunningham actually thought that the appellant was going to flee the scene in his vehicle. 10 RR 57.

Even though the appellant could have driven away without causing his car to contact the police car, he did not do so. According to a diagram of the crime scene, the appellant drove in a nearly straight line from the location of the dumpster to the site where the two vehicles ultimately came to rest. *See* State's Exh. 84. Officer Cunningham testified that he considered the appellant's conduct to be a threat, a display of aggression toward him. 10 RR 27, 29.

The initial collision was followed by a brief pause in the movement of the appellant's car. 10 RR 23, 58. During that pause, Cunningham stepped partially out of the police car, drew his weapon, and yelled at the two men in the other car, ordering them to put their hands up. 10 RR 23, 26-28. The officer was "half in and half out" of the police car at the time. 10 RR 26.

13

The two suspects initially failed to comply with officer's order to raise their hands. 10 RR 37-39. Instead of raising his hands, the appellant caused his car to move forward again and push the police car backward. 10 RR 28-29, 58. Officer Cunningham felt threatened and became concerned for his own safety. He was fearful that he would be hurt or killed. 10 RR 33, 61. He testified, "Well, at this point I'm moving backwards and not in control of my vehicle and the other vehicle is not stopping. I'm basically riding with an opened car door. I'm riding the vehicle backwards. If I fall out of this car now, I could get rolled over under my car, my door, his car. There are all kinds of bad things that could happen." 10 RR 28-29.

Officer Cunningham considered the appellant (the driver of the other car), to be the immediate threat and began shooting at the appellant in an attempt to stop that threat. 10 RR 30. He testified, however, that the appellant continued to drive forward and push the police car backward, even after the officer started shooting at him. 10 RR 30. The appellant continued pushing the police car until it went over a curb and was stopped by a large oak tree. 10 RR 30; *see* State's Exh. 2. The force with which the police car was pushed into the tree was such that the trunk of the car "wrapped around" that tree. 10 RR 30.

Other evidence supports Officer Cunningham's testimony that the police car was "pushed" backward by the appellant's car. Viewed in the requisite light, the evidence refutes any notion that the police car was propelled into the tree either by

14

the force of the initial impact or by its own engine. The appellant's car remained in contact with the police car even at that final resting place. 9 RR 55; *see* State's Exhibits 1 and 2. At the final resting place of the appellant's car, tire marks were found on the ground behind both front tires of that car, which was a front-wheel-drive vehicle. 9 RR 55. Those tire marks support an inference that the car "was still attempting to accelerate" at that point.[2] *Id.* Indeed, the jury could reasonably have concluded that the appellant intended to push the police car either into the tree or beyond the tree.

In his brief, the appellant argues that "there was absolutely no testimony that anyone was actually in danger or harmed by Appellant's driving." App. Brief at 12; *see id.* at 13. That argument ignores all of the evidence addressed above. Moreover, the appellant's claim regarding harm fails to give due consideration to the applicable standard of review. Here, the record reflects that Officer Cunningham suffered some injuries during this incident. He testified as follows:

> Q. Now, I think you've already testified that you were fearful that you could be hurt or killed. Did you [suffer] any injury as a result of this incident?

---

[2] In his second point of error, the appellant challenges the admission of certain testimony by Sgt. Jones. Even if it assumed, *arguendo*, that Jones's testimony relating to acceleration of the appellant's car was not properly admitted, that testimony must still be considered during this Court's review of the sufficiency of the evidence. *See Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001); *Allen v. State*, 249 S.W.3d 680, 688-89 (Tex. App.—Austin 2008) ("In assaying all the evidence under the *Jackson* standard of review, an appellate court must consider all evidence, rightly or wrongly admitted, that the trier of fact was permitted to consider").

15

A. I went to the hospital for an injury to my left leg. And then the next morning I guess kind of after you've been in a car accident, so to speak, your body feels sore. And I definitely had some bruising to my left rib area. And my uniform patrol shirt was ripped and my vest was also damaged.

Q. And no broken bones?

A. No, sir.

Q. Just bruises and that sort of thing?

A. That's correct.

Q. Including on your leg?

A. That's correct.

10 RR 33.

During his testimony, Officer Cunningham was not asked to explain precisely how, or precisely when during the incident, the bruising to his rib area occurred. And when asked to pinpoint the object that caused the injury to his leg, Cunningham was unable to do so:

Q. You don't know whether that came from the door or the bush or anything like that?

A. I have no idea where it came from.

10 RR 59.

Nevertheless, the standard of review requires that all of this evidence be viewed in the light most favorable to the State. *See Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778. Viewed in that light, the evidence supports a finding that the officer actually sustained injuries to his chest and his leg as a direct consequence of the manner in which the appellant used his vehicle.

This evidence likewise supports an inference that the appellant acted with intent to injure Officer Cunningham. As was pointed out above, an intent to use

16

an object in a manner capable of causing death or serious bodily injury can be inferred where the actor actually uses the object to inflict injury. *See, e.g.*, *Bailey v. State*, 46 S.W.3d 487, 491. Such an intent can also be inferred here by virtue of the evidence that appellant used his car in a threatening manner. *See McCain*, 22 S.W.3d 497, 503 ("objects used to threaten deadly force are in fact deadly weapons"); *see, e.g.*, 10 RR 27, 29, 33, 61.

## b. The car was capable of causing death or serious bodily injury

As was pointed out above, the central question here is whether the appellant's car, "in the manner of its use or intended use [was] *capable* of causing death or serious bodily injury." Tex. Penal Code § 1.07(a)(17)(B) (emphasis added). "Capability is evaluated based on the circumstances that existed at the time of the offense." *Drichas*, 175 S.W.3d 795, 799.

In the instant case, the testimony Officer Cunningham supports a finding that the appellant's vehicle was in fact capable of causing death or serious bodily injury. He testified, *inter alia,* as follows:

> Q. Okay. Now, officer, in your training and experience as a police officer, can an automobile be a deadly weapon?
> A. Yes.
> Q. And in the manner of its use on this particular occasion by Mr. Macias, did you feel that it was capable of causing death or serious bodily injury to you?
> A. I did think that.

17

10 RR 39-40. Consistent with that testimony, Officer Cunningham testified that he felt threatened, that he was concerned for his safety, and that he was fearful that he would be hurt or killed. 10 RR 33, 61.

In addition, Cunningham specifically identified some of the ways in which the car could have killed him or caused serious injuries:

> I could get rolled over under my car, my door, his car. There are all kinds of bad things that could happen.

10 RR 28-29.

In his brief, the appellant argues that "the State failed to meet the requirement that it show "that the object have more than a hypothetical capability of causing death or serious bodily injury." App. Brief at 13, citing *Johnston v. State*, 115 S.W.3d 761, 764 (Tex. App.—Austin 2003), *aff'd*, 145 S.W.3d 215, (Tex. Crim. App. 2004); *Mann v. State*, 13 S.W.3d 89, 92 (Tex. App.—Austin 2000), *aff'd*, 58 S.W.3d 132 (Tex. Crim. App. 2001).

That claim, however, lacks merit. Here, the evidence supports a finding that Officer Cunningham was placed in actual danger. This was not a situation where the potential or hypothetical danger did not actually exist. *See Mann*, 13 S.W.3d at 92 ("To sustain a deadly weapon finding requires evidence that others were endangered, and not merely a hypothetical potential for danger if others had been present"); *compare Johnston*, 115 S.W.3d at 764 ("[T]he lit cigarette in this case could only be capable of causing death or serious bodily injury if used in a manner

18

different from that supported by the record…. The fact that appellant *could* have caused serious bodily injury if he had used, or intended to use, the cigarette in a way other than he actually did does not support a deadly weapon finding."). *See, e.g., Newsome v. State*, 01-14-00834-CR, 2015 Tex. App. LEXIS 7365 (Tex. App.—Houston [1st Dist.] July 16, 2015) (not designated for publication) (rejecting appellant's argument that danger was merely hypothetical, where appellant claimed that his car "slowly travelling backwards two feet posed no danger to the officer" who jumped out of the way of the vehicle as it came toward him).

## 5. Conclusion

Viewed in the light most favorable to the State, the evidence supports a rational inference that the appellant's vehicle was, in the manner of its use and intended use during the offense, capable of causing death or serious bodily injury. Accordingly, this Court should find the evidence legally sufficient to establish that the appellant used or exhibited a deadly weapon, i.e., a motor vehicle, during the commission of the offense. The first point of error should be overruled.

## THE STATE'S REPLY TO THE SECOND POINT OF ERROR

THE TRIAL COURT DID NOT ABUSE ITS DISCRETION WHEN IT OVERRULED THE APPELLANT'S OBJECTION TO THE TESTIMONY OF SGT. JONES.

### Argument and Authorities

In his second point of error, the appellant asserts, "The trial court abused its discretion in permitting a police officer to give his opinion as to what transpired in this case when he had no personal knowledge upon which to base his opinion and his opinion supplanted the jury's determination of guilt or innocence." App. Brief at 14. The essence of this claim, which relates to the testimony of Sgt. Steven Jones, is that "Jones was not qualified as an expert" and that his opinion testimony could only have been admissible as "that of a lay person." App. Brief at 14. That premise is flawed, however, because Sgt. Jones did qualify as an expert. The trial court did not abuse its discretion when it overruled the appellant's objection to the admission of Sgt. Jones's opinion testimony.[3]

### 1. Background

During the trial, the State called Sgt. Steven Jones as a witness. Jones testified that, in August 2013, he was a detective with the Austin Police

---

[3] To the extent that the appellant complains about the admission of Sgt. Jones's non-opinion testimony concerning the existence, location, or condition of tire marks at the crime scene, that claim lacks merit because Jones has personal knowledge. He actually observed those marks on the ground when he went to the scene shortly after the incident. While there, he also saw each vehicle in its final resting place. *See* 9 RR 46-47.

Department's Vehicular Homicide Unit.[4]  He told the jury that, when he was with that unit, he was considered to be "[j]ust a detective" who did "basic crash investigation."  9 RR 32.  Describing his training, Jones testified as follows:

> Q. Can you just kind of briefly tell the jury what that training entailed?
> A. Sure. There's plenty of accident investigators in -- excuse me, I call it crash investigators. There is plenty of crash investigators in the city of Austin with the police department. They can be at patrol level and essentially they go through a two-week course that certifies them in going to vehicle accident scenes or crash scenes and looking at tire marks and damage on cars and basically just putting together essentially what happened during the crash and then being able to document in either a crash report or a diagram. So that's our initial training and I went through that many years ago. I have gone through that class twice, once when I became a detective.
> In 2012 I went through a vehicle dynamics class, which is a very intense physics- and mathematics-based class, to help you if you ever need to put mathematics on a crash like conservation of momentum or conservation of energy to try and basically investigate how a crash occurred.

9 RR 33.

Sgt. Jones told the jury that he was not "an accident reconstructionist."  9 RR 32.  He explained:

> Q. What is an accident reconstructionist?
> A. An accident reconstructionist is actually an accident investigator or lead detective who has gone through multiple schools in reconstruction and essentially a crush discipline. They can determine how fast cars were going based on the crush inside the car. They have

---

[4] At the time of his testimony, Jones was working for the Austin Police Department ("APD") as a patrol sergeant.  9 RR 31.

21

a lot of advanced physics training and mathematics training to be able to actually reconstruct how a crash happened.

9 RR 32.

During a hearing outside the presence of the jury, Sgt. Jones elaborated on the training he had received, testifying that his vehicle dynamics class was a two-week course and that he had also received on-the-job training. 9 RR 36. He also testified that, at the scene of the incident at issue here, he used a laser-based surveyor's machine known as the Leica Total Station to measure tire marks and other things. 9 RR 37.

During the hearing, Jones was asked whether he had developed a hypothesis as to what had happened at the scene of the incident. He responded that he had done so and that a full-blown accident reconstruction was not warranted in this particular case:

> Q. Even though you weren't trained in formal accident reconstruction or vehicle crush or the like, correct?
> A. Yeah, this incident didn't need a full-blown construction. We do the reconstruction based on the need for it because it's very time and labor intensive. This is no more than a patrol officer would need to do on a regular crash. Just look at the tire marks, the resting positions of the vehicles, and determine or at least get a hypothesis about how those vehicles came to that position. You work backwards and there is no math involved.
> Q. So you're saying that the analysis that you performed in this particular case was nothing more than -- or any more specialized than what a regular patrol officer would do at a scene?
> A. A regular patrol officer who is an accident investigator.

9 RR 38.

22

Sgt. Jones pointed out that, "in vehicle homicide, they do approximately two to three reconstructions a year out of the hundreds and hundreds of crashes." 9 RR 39. He explained that an analysis involving "conservation of energy and conservation of momentum based on Newton's third law" was not required in this particular case. 9 RR 39.

Jones testified that he was required by his job to form hypotheses and make conclusions about how accidents occurred:

> Q. In your training and experience, from the training that you've received, are you permitted to make conclusions or form hypotheses about how an accident occurred and to either attribute fault or something else?
> A. I'm mandated. It's my job.

9 RR 39.

During the hearing, defense counsel asserted the following objection:

> THE COURT: Do you have an objection?
> MR. URRUTIA: Yes, Your Honor. I would have an objection to a hypothesis drawn by this officer. He is admittedly not an accident reconstructionist and his testimony is going to be based on what an officer would have documented at the scene. So his hypothesis is not based on any science with regard to accident reconstruction, but mainly based on just what he has gathered that's not any kind of specialized field. So qualifying him as an expert or an accident reconstructionist expert I think would be giving the witness undue credibility in front of the jury.
> So if he wants to talk about what he documented at the scene, that's fine. But with regard to the conclusions, I don't think he has the expertise to make those conclusions. So we would object to the testimony in that regard.

9 RR 40.

In response, the prosecutor pointed out, *inter alia*, that Jones had not been tendered as an accident reconstructionist and that Jones had testified "that there was no accident reconstruction required in this very, very … simple incident." 9 RR 41.

The trial court overruled the objection, stating that the officer would be allowed "to testify as to his observations and conclusions based on his training." 9 RR 41. In addition, the trial court asked the prosecutor "to once more clarify for the record in front of the jury that the officer is not testifying as an accident reconstruction expert but only based upon his conclusions as a trained officer investigating accidents but not as a[n] accident reconstruction expert."[5] *Id.*

### 2. **Standard governing admission of expert testimony at trial**

The admission of expert testimony is governed by Rule 702 of the Texas Rules of Evidence. That rule provides as follows:

> Rule 702 Testimony by Experts
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Tex. R. Evid. 702.

---

[5] When the direct examination of Sgt. Jones resumed in the presence of the jury, the State elicited testimony that provided the clarification requested by the trial court. *See* 9 RR 42.

24

Before admitting expert testimony pursuant to this rule, "the trial court must be satisfied that three conditions are met: (1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact-finder in deciding the case." *Rodgers v. State*, 205 S.W.3d 525, 527 (Tex. Crim. App. 2006). These three conditions are commonly referred to, respectively, as (1) qualification, (2) reliability, and (3) relevance. *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006). Each of these requirements will be addressed in greater detail below.

The burden of establishing the admissibility of the expert's opinion rests upon the party offering the evidence. *Lopez v. State*, 628 S.W.2d 77, 79 (Tex. Crim. App. 1982). The requirements for admissibility of expert testimony must be satisfied "by a preponderance of the evidence under Rule 104(a)." Brown & Rondon, *Texas Rules of Evidence Handbook* (2013) at 680 (citing *Amis v. State*, 910 S.W.2d 511, 517 (Tex. App.—Tyler 1995, pet. ref'd), and *Kelly v. State*, 792 S.W.2d 579, 585 (Tex. App.—Fort Worth 1990), *aff'd*, 824 S.W.2d 568 (Tex. Crim. App. 1992)); *see* Tex. R. Evid. 104(a).

3. **Standard governing appellate review of trial court's decision admitting expert testimony**

The admission of expert testimony is reviewed under the abuse-of-discretion standard. *Rodgers*, 205 S.W.3d at 528; *Harnett v. State*, 38 S.W.3d 650, 657 (Tex.

25

App.—Austin 2000, pet. ref'd). The appellate court must review the trial court's ruling in light of what was before that court at the time the ruling was made. *Rodgers* at 528. If the expert testimony at issue was admissible for any purpose, the admission of that evidence must be upheld on appeal, even if that purpose was not asserted at trial and even if the trial court gave the wrong reason for admitting the evidence. *King v. State*, 129 S.W.3d 680, 683 (Tex. App.—Waco 2004, pet. ref'd).

"'The question of whether a witness offered as an expert possesses the required qualifications rests largely in the trial court's discretion. Absent a clear abuse of that discretion, the trial court's decision to admit or exclude testimony will not be disturbed.'" *Rodgers*, 205 S.W.3d at 528 n9, quoting *Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000); *see Harnett*, 38 S.W.3d 650, 657. "[A]ppellate courts rarely disturb the trial court's determination that a specific witness is or is not qualified to testify as an expert." *Rodgers* at 528 n9; *Vela*, 209 S.W.3d 128, 136.

### 4. <u>The trial court did not abuse its discretion</u>

Here, the trial court could reasonably have concluded that the opinion testimony of Sgt. Jones was admissible because the three prerequisites had been satisfied, i.e., (1) that Jones qualified as an expert by reason of his knowledge, skill, experience, training, or education; (2) that the subject matter of Jones's

26

testimony was an appropriate one for expert testimony; and (3) that admitting the expert testimony would actually assist the jury in deciding the case. *See Rodgers*, 205 S.W.3d 525, 527.

### a. Jones was qualified to provide expert testimony

No rigid formula exists for determining whether a particular witness is qualified to testify as an expert. *Harnett,* 38 S.W.3d 650, 658. Instead, the nature and extent of the expertise required of the witness must be measured against the particular opinion the witness is offering. *Roise v. State*, 7 S.W.3d 225, 234 (Tex. App.—Austin 1999), cert. denied, 531 U.S. 895, 121 S.Ct. 225, 148 L.Ed.2d 160 (2000). Accordingly, qualification is a two-step inquiry: "A witness must first have a sufficient background in a particular field, but a trial judge must then determine whether that background 'goes to the very matter on which [the witness] is to give an opinion.'" *Vela*, 209 S.W.3d 128, 131. "The focus, then, is on the 'fit' between the subject matter at issue and the expert's familiarity therewith…." *Id*. at 133.

Rule 702 itself provides that the requisite expertise may have been acquired through knowledge, skill, experience, training, or education. That rule expressly refers to "specialized knowledge." Tex. R. Evid. 702. Such knowledge may be acquired by virtue of the witness's experience, and there is no *per se* requirement

that the witness be licensed or certified in a particular discipline. *Harnett,* 38

S.W.3d at 658-59.

Moreover, a trial court need not exclude expert testimony simply because

the subject matter is within the comprehension of the average jury:

> If the witness has some special knowledge or additional insight into the field that would be helpful, then the expert can assist the trier of fact to understand the evidence or to determine a fact in issue. An expert "may add precision and depth to the ability of the trier of fact to reach conclusions about subjects which lie well within common experience." Because the possible spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses sufficient qualifications to assist the jury as an expert on a specific topic in a particular case.

*Rodgers*, 205 S.W.3d at 527-28 (citations omitted).

In the instant case, the record supports a conclusion that Sgt. Jones had

training, experience, and specialized knowledge relating to the identification,

measurement, and significance of tire marks for purposes of basic crash

investigations. In light of this record, this Court should find that there has been no

clear abuse of discretion by the trial court.

An appellate court may properly consider three criteria when assessing

whether a trial court has abused its discretion in ruling on an expert's

qualifications. Those criteria were addressed by the Court of Criminal Appeals in

*Rodgers*:

> First, is the field of expertise complex? The degree of education, training, or experience that a witness should have before he can

28

qualify as an expert is directly related to the complexity of the field about which he proposes to testify.  If the expert evidence is close to the jury's common understanding, the witness's qualifications are less important than when the evidence is well outside the jury's own experience….   Second, how conclusive is the expert's opinion?  The more conclusive the expert's opinion, the more important is his degree of expertise….   And third, how central is the area of expertise to the resolution of the lawsuit?  The more dispositive it is of the disputed issues, the more important the expert's qualifications are.

*Rodgers*, 205 S.W.3d at 528 (citations omitted).

### i.   **The first criterion**

The first of these criteria asks, "[I]s the field of expertise complex?"

*Rodgers*, 205 S.W.3d at 528; *see id.* ("For example, DNA profiling is scientifically

complex; latent-print comparison (whether of fingerprints, tires, or shoes) is not.").

The answer in this case is "no."  Here, the trial court could reasonably have

concluded that "the expert evidence [was] close to the jury's common

understanding" and that a person could qualify as an expert in this narrow field

with relatively little education, training, and experience.  *Id.*  According to Sgt.

Jones, there are "plenty" of crash investigators employed by APD, and completion

of the two-week course that he described is sufficient to certify their competency to

do the work.  *See* 9 RR 33.

Jones was not proffered as an accident reconstructionist, and he made it clear

that he is not one.  9 RR 32, 40-41.  Instead, he characterized his role with the

Vehicular Homicide Unit as "[j]ust a detective" who did "basic crash

29

investigation." 9 RR 32. He described his work as "looking at tire marks and damage on cars and basically just putting together *essentially* what happened during the crash and then being able to document in either a crash report or a diagram." 9 RR 33 (emphasis added). Jones also made it clear that an analysis of the type performed by accident reconstructionists (i.e., those addressing conservation of energy and conservation of momentum) was not required in this case. 9 RR 39.

The appellant relies heavily upon the fact that Sgt. Jones was a crash investigator and not an accident reconstructionist. It is true that crash investigators are not required to undergo as much training as accident reconstructionists. That distinction, however, does not compel the conclusion that crash investigators have no expertise. Nor does that distinction suggest that the analyses and conclusions of crash investigators are inherently flawed. Those conclusions are, in a word, "basic." 9 RR 32. For purposes of this analysis, it is inconsequential that *additional* conclusions could be made by a person with *additional* expertise. In this particular case, for example, an accident reconstructionist might have been able to "determine how fast cars were going based on the crush inside the car." 9 RR 32. While information relating to vehicular speed might have had some probative value, Sgt. Jones's inability to provide that information does not suggest that he was unable to accurately identify and measure tire marks, draw inferences

30

from those marks, and "add precision and depth to the ability of the trier of fact to reach conclusions" about the import of those marks. *Rodgers*, 205 S.W.3d at 528. Accordingly, the Court should find that the field of expertise is not complex.

### ii. **The second criterion**

The second criterion that may be used by an appellate court when assessing whether a trial court has abused its discretion in ruling on an expert's qualifications asks this question: "[H]ow conclusive is the expert's opinion? The more conclusive the expert's opinion, the more important is his degree of expertise." *Rodgers*, 205 S.W.3d at 528; *see id.* ("Testimony that 'a given profile occurred one time in 2.578 sextillion…' requires a much higher degree of scientific expertise than testimony 'that the defendant's tennis shoe could have made the bloody shoe print found on a piece of paper in the victim's apartment.'").

When Jones testified in the presence of the jury, his opinions were not especially conclusive.[6] He made numerous references to "acceleration marks," which is apparently a term of art. But when testifying about the actual acceleration of the appellant's vehicle (which is the testimony about which the appellant complains), Jones's testimony was often couched in language suggesting that his

---

[6] In this case, the trial court did not, at the time of its ruling, have any specific information as to the conclusions reached by Sgt. Jones in this case. *See id.* at 528-29 ("the appellate court must review the trial court's ruling in light of what was before that court at the time the ruling was made").

conclusion might not be definitive.  He testified, for example, that "*it appeared that the car was accelerating, moved, hit a solid object, and then started decelerating.*"  9 RR 54 (emphasis added); *see also id.* at 55 ("And *it just appeared to me* that when it got to that final resting spot, it was still in acceleration"); *id.* at 60-61 ("*It's a good indication* that there's some acceleration there. Whether it stopped and started accelerating or started accelerating during roll, *it's difficult to tell* at that point.").  On the whole, Sgt. Jones's testimony about the acceleration of the appellant's car was simply that the car "accelerated."  Only once did he make a comment regarding the *rate* of that acceleration, and that particular comment was both vague and couched in terms of a hypothesis.  *See* 9 RR 62 ("So the hypothesis after we completed our part of this mapping scene is that the Acura was up against the dumpster, it started to accelerate rapidly").

Importantly, all of this witness's jury testimony regarding the acceleration marks and the import of those marks was preceded (as required by the trial court) by assertions that Sgt. Jones was not an accident reconstructionist.  *See* 9 RR 32, 41-42.  Jones's isolated reference to a "rapid[]" acceleration must be viewed through that lens.  The record is clear that, as a crash investigator, he was not qualified to "determine how fast cars were going based on the crush inside the car."  9 RR 32.

32

This Court should find that this witness's expert opinion was conclusive, at most, only as to the location and identity of the various acceleration marks and the paths taken by the two vehicles. It clearly did not purport to be conclusive as to the rate of acceleration, evidence of which would have been significantly more probative of the appellant's intent than were Jones's undetailed assertions that the car "accelerated."

In his brief, the appellant argues that "Jones [gave] his opinion that Appellant accelerated his vehicle toward Cunningham's patrol car, *implying that Appellant acted intentionally or knowingly*." App. Brief at 14 (emphasis added). While a person might *infer* from the totality of the evidence that the appellant acted with one of those mental states (as the jury so found), Jones did not *imply* any such thing. His comments focused on the tire marks at the crime scene and the movement of the vehicles, not on the actions or mental state of the appellant. More to the point, even if it is assumed that Jones did in fact "imply[] that Appellant acted intentionally or knowingly," his act of doing so cannot reasonably be considered to be a conclusive expert opinion.

### iii. The third criterion

The third criterion that may be used by an appellate court when assessing whether a trial court has clearly abused its discretion in ruling on an expert's qualifications asks this question: "[H]ow central is the area of expertise to the

33

resolution of the lawsuit? The more dispositive it is of the disputed issues, the more important the expert's qualifications are." *Rodgers*, 205 S.W.3d at 528; *see id.* ("If DNA is the only thing tying the defendant to the crime, the reliability of the expertise and the witness's qualifications to give his opinion are more crucial than if eyewitnesses and a confession also connect the defendant to the crime")

In the instant case, the appellant's mental state was the primary issue in dispute. *See, e.g.,* 8 RR 215 (where defense counsel asserts, in opening statement, "What he is on trial for you're going to have to divine and what the State is going to ask you to divine is in that one instant what his intent was"); 10 RR 127 (where defense counsel, during closing argument, states, "Judge for yourself. Look at the video. See what it shows you. Is he reacting or is he intending?").

Sgt. Jones's area of expertise was not central to the resolution of the charge against the appellant. As was stated above, Jones's testimony focused on the tire marks and the movement of the vehicles, not on the actions or mental state of the appellant. While Sgt. Jones's testimony was consistent with the testimony of the victim, i.e., Officer Cunningham, and provided circumstantial evidence of the appellant's mental state, it was neither crucial nor dispositive. The jury received, from other sources, evidence that was likely more probative on the issue of intent, such as Officer Cunningham's eyewitness testimony and the video from his patrol car (i.e., State's Exh. 86).

### iv. **The trial court did not err**

Considered together, the three criteria weigh in favor of a determination by this Court that the trial court did not abuse its discretion when it implicitly found that Sgt. Jones was sufficiently qualified to provide expert testimony.

### b. **Tire mark analysis was an appropriate topic for expert testimony**

Before admitting expert testimony pursuant to Rule 702, the trial court must be satisfied that admitting the expert testimony is reliable, i.e., that "the subject matter of the testimony is an appropriate one for expert testimony." *Rodgers*, 205 S.W.3d 525, 527. An assessment of the reliability of proffered expert testimony is governed by Rule 705(c), which provides, "If the court determines that the underlying facts or data do not provide a sufficient basis for the expert's opinion under Rule 702 or 703, the opinion is inadmissible." Tex. R. Evid. 705(c).

In *Kelly*, the Court of Criminal Appeals held that scientific evidence must meet three criteria to be reliable: "(a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question." *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). Notwithstanding that ruling, trial courts are afforded considerable flexibility in assessing reliability, and the three *Kelly* criteria do not always apply:

> And even if the traditional *Kelly* reliability factors do not perfectly apply to particular testimony, the proponent is not excused from

proving its reliability. As the Texas Supreme Court recognized, "The court in discharging its duty as gatekeeper must determine how the reliability of particular testimony is to be assessed." The reliability inquiry is, thus, a flexible one. <u>In some cases, the reliability of scientific knowledge will be at issue; in others, "the relevant reliability concerns may focus upon personal knowledge or experience</u>." But the proponent must establish some foundation for the reliability of an expert's opinion. "<u>Experience alone may provide a sufficient basis for an expert's testimony in some cases</u>, but it cannot do so in every case."

*Vela*, 209 S.W.3d 128, 134 (citations omitted, emphasis added).

In the instant case, the trial judge could reasonably have concluded that the testimony of Sgt. Jones concerning tire marks and their significance was reliable by virtue of Jones's completion of the initial two-week course on crash investigation, his completion of the additional course on vehicle dynamics, his on-the-job training, and his experience as a detective in the APD Vehicular Homicide Unit. As described by Sgt. Jones, the initial course "<u>certifies</u> them [i.e., APD crash investigators] in going to vehicle accident scenes or crash scenes and looking at tire marks and damage on cars and basically just putting together essentially what happened during the crash." 9 RR 33 (emphasis added).

The appellant has not established that the trial court abused its discretion when it implicitly found that the subject matter of Jones's testimony (i.e., the location and significance of tire marks) was an appropriate topic for expert testimony.

36

### c. **The expert testimony was relevant**

Before admitting expert testimony pursuant to Rule 702, the trial court must be satisfied that admitting the expert testimony is relevant, i.e., that it "will actually assist the fact-finder in deciding the case." *Rodgers*, 205 S.W.3d 525, 527. In the instant case, the trial court could reasonably have concluded that the testimony of Sgt. Jones concerning the tire marks and other features of the crime scene would shed light on the events that occurred there. That testimony was relevant, in particular, for purposes of establishing the paths in which the two vehicles traveled during the incident. Those issues, in turn, had a bearing on the issue of whether the appellant acted intentionally or knowingly, on the issue of whether Officer Cunningham was threatened, and on the issue of whether the appellant's vehicle was used or exhibited as a deadly weapon. In short, the evidence supports a finding by this Court that the trial court did not abuse its discretion when it implicitly determined that Sgt. Jones's testimony was relevant.

### d. **No abuse of discretion has been shown**

Because no clear abuse of discretion has been shown, the appellant's second point of error should be overruled.

## 5. **Any error was harmless**

Assuming, *arguendo*, that the trial court erred by overruling the appellant's objections to the challenged testimony, any error was harmless. Generally, the

erroneous admission of evidence is non-constitutional error governed by Rule 44.2(b) if the trial court's ruling merely offends the rules of evidence. *Bagheri v. State*, 119 S.W.3d 755, 762-63 (Tex. Crim. App. 2003). Under Rule 44.2(b), any non-constitutional error "that does not affect substantial rights must be disregarded." Tex. R. App. P. 44.2(b). A substantial right is affected if the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). A criminal conviction should not be overturned for non-constitutional error if the appellate court, after examining the record as a whole, has fair assurance that the error either did not influence the jury or had but slight effect. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

In the instant case, the appellant complains, *inter alia*, "Clearly, the admission of Jones's opinion that Appellant accelerated towards Cunningham affected the jury's verdict. This was the State's only evidence that Appellant acted intentionally or knowingly, and therefore, necessarily affected the outcome of Appellant's trial." App. Brief at 17-18 (footnote omitted).[7] As was pointed out

---

[7] The omitted footnote states, "Other witnesses testified as to the events in this case, and the jury was shown video, but no one testified Appellant's actions were intentional or knowing. On the contrary, the record reflects that Appellant was simply trying to "get away" and was in the throws of a 'fight or flight' response." App. Brief at 18 n3.

above, Sgt. Jones neither stated nor implied anything about the appellant's mental state.

As a starting point, it should be noted that any potential harm associated with testimony addressing acceleration was minimized because the prosecutor (pursuant to the trial court's directive) elicited from Jones testimony that he was not an accident reconstructionist. *See* 9 RR 41- 42. That fact is significant here in light of Jones's testimony that only accident reconstructionists are able to determine vehicular speeds. *See* 9 RR 32.

The potential strength of the challenged testimony was also mitigated by the fact that Jones's testimony was often couched in language suggesting that his conclusion might not be definitive. He testified, for example, that "*it appeared* that the car was accelerating, moved, hit a solid object, and then started decelerating." 9 RR 54 (emphasis added).

Perhaps most importantly, any error relating to the admission of Sgt. Jones's opinion testimony was rendered harmless by the fact that the same facts are proven by other properly admitted evidence. *See Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999). In particular, Jones's testimony regarding the acceleration of the appellant's vehicle was harmless because the fact of that acceleration was also established by Officer Cunningham's testimony about the movement of that car toward him. Cunningham testified, for example, that the

39

appellant "[p]ulls forward and hits me head-on."  10 RR 22.  The following

testimony is another example:

> Q. All right. So the car *accelerates forward*, hits you in the front.
> What do you do from there?
> A. Radio in that *I have been hit, been struck*.

10 RR 23 (emphasis added).  *See also* 10 RR 28-29 ("Well, at this point I'm

moving backwards and not in control of my vehicle and *the other vehicle is not*

*stopping*"); 10 RR 20 ("*The suspect vehicle pushed* my vehicle and the trunk

wrapped around a large oak tree"); 10 RR 57 (where Cunningham agrees that he

"[got] bumped").

In addition, the video captured by the Officer Cunningham's police car was

played for the jury.  *See* State's Exh. 86; 10 RR 37.  The jury also viewed a

surveillance video that captured the incident.  *See* State's Exh. 83; 9 RR 7-9.

Those videos actually displayed, from two different vantage points, the events at

issue here, events that Sgt. Jones did not witness and could describe only on the

basis of his analysis.

Finally, to the extent that the appellant complains about Sgt. Jones's use of

the word "acceleration," that usage was harmless because that same word was also

used by another expert witness who was not present when the incident occurred.

Specifically, Dr. Al Yonovitz—an audiologist who testified as a witness for the

defense—testified about his analysis of the DMAV video and audio from Officer

40

Cunningham's police car. When questioned by defense counsel during direct examination, Dr. Yonovitz testified as follows, stating not only that the appellant's *car* accelerated, but also that *the appellant* did so :

> (BY MR. ESTRADA) I'll play that again.
> (Audio played)
> Q. (BY MR. ESTRADA) Then we have the next event here.
> A. Is Macias' car *accelerates*. You can hear the engine rev and *it's moving forward* now.
> Q. And what are we looking at?
> A. It's only three seconds since the impact.
> Q. And what are we looking at, doctor?
> A. *At this point <u>Macias is accelerating forward</u> and you can hear the engine rev*.

10 RR 106 (emphasis added). *See also* 10 RR 102 ("*Macias then accelerates forward*. The engine revs and that's clearly audible and measurable."

This Court should find that any error was harmless.

## 6. <u>Conclusion</u>

For all of the reasons set forth above, the appellant's second point of error should be overruled.

## THE STATE'S REPLY TO THE THIRD POINT OF ERROR

THE EVIDENCE IS LEGALLY SUFFICIENT TO ESTABLISH THAT THE
APPELLANT ACTED EITHER INTENTIONALLY OR KNOWINGLY.

### Argument and Authorities

In his third point of error, the appellant asserts, "The evidence is insufficient to show Appellant committed the offense in this case intentionally or knowingly." Appellant's Brief at 18. That point lacks merit and should be overruled.

### 1. Standard governing legal-sufficiency review

When assessing the legal sufficiency of the evidence to support a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 5 (1979) (emphasis in original); *see Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Other pertinent information about this standard is summarized above in relation to the appellant's first point of error. That summary is incorporated herein by reference.

### 2. Definitions of "intentionally" and "knowingly"

The appellant was found guilty of aggravated assault, an offense defined by Penal Code section 22.02. To commit that offense, the actor must, *inter alia*, "commit an assault as defined in Section 22.01." Tex. Penal Code § 22.02(a). To

42

commit an assault under the pertinent subsection of section 22.01, the actor must "*intentionally or knowingly* threaten another with imminent bodily injury." *Id.*, § 22.01(a)(2) (emphasis added).

The resolution of the appellant's claim hinges upon the definitions of the terms "intentionally" and "knowingly." For purposes of a sufficiency analysis, the elements of an offense are defined, not by reference to the indictment or the jury charge, but instead by reference to a hypothetically correct jury charge. *Anderson*, 416 S.W.3d 884, 889 (Tex. Crim. App. 2013); *Malik*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge is "one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." 953 S.W.2d at 240.

In this case, a hypothetically correct jury charge would track the applicable portions of the Penal Code's definitions of the terms "intentionally" and "knowingly." The Code provides, *inter alia*, as follows:

> § 6.03. Definitions of Culpable Mental States
>   (a) A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.
>   (b) A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct

when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.
\*\*\*

Tex. Penal Code § 6.03.[8]

Assault under Penal Code section 22.01(a)(2) is a conduct-oriented offense, focusing upon the act of making a threat, regardless of any result that threat might cause. *Landrian v. State*, 268 S.W.3d 532, 536 (Tex. Crim. App. 2008). Consequently, the definitions of "intentionally" and "knowingly" included in a hypothetically correct jury charge should only reference the nature of the conduct, not the result of the conduct. *See McQueen v. State*, 781 S.W.2d 600, 603 (Tex. Crim. App. 1989). In other words, a hypothetically correct jury charge in this case would instruct the jury that "[a] person acts intentionally, or with intent, with respect to the nature of his conduct … when it is his conscious objective or desire to engage in the conduct" (Tex. Penal Code § 6.03(a)) and that "[a] person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist" (*id.*, § 6.03(b)).

---

[8] These definitions were set forth in the jury charge. CR 79.

44

**3.  The evidence is legally sufficient to establish that the appellant acted intentionally or knowing**

It is well settled that "[i]ntent may … be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant." *Merritt v. State*, 368 S.W.3d 516, 526 (Tex. Crim. App. 2012); *see Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995).  During a sufficiency analysis, direct and circumstantial evidence must be treated equally.  *Clayton*, 235 S.W.3d at 778. "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

Suggesting that he did not intentionally or knowing threaten Officer Cunningham, the appellant refers to testimony from his accomplice that the appellant "was trying to 'get away' from the situation."  App. Brief at 20. However, that argument misses the mark because the standard of review requires that the all of the evidence be viewed in the light most favorable to the State.  In light of the circumstantial evidence that the appellant intentionally or knowingly caused his vehicle to strike the patrol car, this Court should disregard any evidence suggesting that the appellant did not act with the requisite mental state.  *See Jackson*, 443 U.S. 307, 319.

The evidence clearly establishes that the appellant was driving his car when the car backed into the dumpster and then moved forward toward the police car.

45

For example, the appellant's accomplice, Austin Hanlon, described how the appellant put the car in gear and caused it to move. 9 RR 122. He specifically testified that the car backed up and went forward. *Id*. Indeed, as described by Hanlon, the appellant drove the car into the police car three times:

> Q. So you say he put the car in gear. Do you recall if he went backwards first before he went forwards?
> A. He went forwards. Forwards first and then *hit the police car*.
> Q. Then what happened?
> A. Then backed up to try to get away from the police car and proceed to *hit the police car again*.
> Q. Then what happened?
> A. Then backed up again and proceeded to *hit a third time*.
> Q. So you think he hit it three times?
> A. Yes.
> Q. And if the videotape shows something different, you wouldn't have any argument with that?
> A. No, sir.

9 RR 122 (emphasis added).

And the evidence suggests that the appellant was fully aware that the vehicle in front of him was a police car. The appellant first saw the police car when he and his accomplice were exiting the building that they had burglarized. 9 RR 120. The accomplice testified that it was a black and white police car and that "it was clear that it was an APD officer." 9 RR 121.

In this situation, the jury could reasonably have concluded that the appellant made no attempt to avoid the police car as the appellant drove forward. Officer Cunningham testified that there were multiple access points from which to enter

46

and exit the parking lot. 10 RR 23. He also testified that, before the initial collision occurred, there was sufficient space between the vehicles for the appellant to turn his car and flee the scene if the appellant wanted to do so. *Id.*

The appellant asserts that "he was shot multiple times and incapacitated." App. Brief at 20. It is true that the appellant was shot during the incident.[9] However, the evidence supports a rational inference that the offense was completed before the shooting even began. Officer Cunningham testified that he felt threatened when the appellant's car first hit the police car. *See* 10 RR 22. It was during the pause following that initial contact that Cunningham aimed his gun and ordered the suspects to put their hands up. 10 RR 23-26. Dr. Yonovitz, the audiologist who analyzed the DMAV video from the police car, provided the following description of those events, pointing out that the appellant's engine revved shortly before the initial contact occurred:

> Macias hits the dumpster in the back, then drives forward. He does not stop. Then Officer Cunningham's car is moving forward and he does attempt to stop. And the car actually stops about .3 seconds before the impact. Macias then accelerates forward. *The engine revs and that's clearly audible and measurable.* And then Officer Cunningham opens his door and yells get your hands up. Twice he yells that. And very quickly after that, about a second or not, a little bit less, he begins multiple shots towards the car.

---

[9] Viewed in the requisite light, the evidence supports an inference that, at the moment when his car came to its final resting place, the appellant still had the capacity to operate the vehicle in an intentional or knowing manner. After the shooting stopped thereafter, he managed to get out of the car, stand by the door, and then get on the ground. 9 RR 125.

10 RR 102-03; *see id*. at 106.

The revving of the appellant's engine refutes any suggestion that his car merely coasted or rolled into the police car. The fact that the engine was revved less than one second before impact suggests that the police car was in close proximity to his car when the engine was revved. Viewed in the light most favorable to the State, this evidence supports an inference that the appellant was, at the very least, "aware" that his car would strike the police car virtually head-on, with the officer inside of it, if the appellant accelerated. Tex. Penal Code § 6.03(b). The fact that the appellant took that action (as is reflected by the revving of his engine) suggests that he either intended to collide with the police car or knew that he would do so.

The fact that the appellant's car subsequently pushed the police car (with Officer Cunningham hanging onto it) across the parking lot, over a curb, and into a tree is further proof that the appellant acted with the requisite mental state.

Finally, as was pointed out above in relation to the appellant's first point of error, Officer Cunningham suffered injuries to his leg and chest during this incident. *See* 10 RR 33. That evidence supports an inference that the appellant acted with intent to injure Officer Cunningham. An intent to use an object in a manner capable of causing death or serious bodily injury can be inferred where the actor actually uses the object to inflict injury. *See, e.g.*, *Bailey*, 46 S.W.3d 487,

48

Such an intent can also be inferred here by virtue of the evidence that appellant used his car in a threatening manner.  *See McCain*, 22 S.W.3d 497, 503 ("objects used to threaten deadly force are in fact deadly weapons"); *see, e.g.*, 10 RR 27, 29, 33, 61.

The appellant's third point of error should be overruled.

## PRAYER

WHEREFORE, the State requests that the Court overrule all of the appellant's points of error and affirm the judgment of the trial court.

Respectfully submitted,

Rosemary Lehmberg
District Attorney
Travis County, Texas

Rachel Palacios
Law Clerk

*/s/ M. Scott Taliaferro*
M. Scott Taliaferro
Texas Bar No. 00785584
Assistant District Attorney
Director, Appellate Division
District Attorney's Office
P.O. Box 1748
Austin, Texas  78767
Phone: 512.854.3626   Fax: 512.854.4810
Email: scott.taliaferro@traviscountytx.gov
  and   AppellateTCDA@traviscountytx.gov

## CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i), I hereby certify, based on the computer program used to generate this brief, that this brief contains 11,756 words, excluding words contained in those parts of the brief that Rule 9.4(i) exempts from inclusion in the word count.

/s/ M. Scott Taliaferro
M. Scott Taliaferro

## CERTIFICATE OF SERVICE

I hereby certify that, on this 9th day of October, 2015, a copy of the foregoing State's brief was sent, via U.S. mail, email, facsimile, or electronically through the electronic filing manager, to the following attorney for the appellant:

Kristen Jernigan, Esq.
207 S. Austin Avenue
Georgetown, TX 78626
Fax No. (512) 931-3650
Email: Kristen@txcrimapp.com

*/s/ M. Scott Taliaferro*
M. Scott Taliaferro
